1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11
KAREN ANN BUCK,

Plaintiff,

12

v.

13
KILOLO KIJAKAZI,
14
Acting Commissioner of Social Security,[1]

15
Defendant.

16

17

18
_____/

Case No. 1:21-cv-00304-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

19

## I.    INTRODUCTION

20    On March 2, 2021, Plaintiff Karen Ann Buck ("Plaintiff") filed a complaint under 42

21 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security

22 (the "Commissioner" or "Defendant") denying her application for disability insurance benefits

23 ("DIB") under Title II of the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently

24 before the Court on the parties' briefs, which were submitted, without oral argument, to the

25 Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

26

27

28

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration.  *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

## II.      BACKGROUND

Plaintiff was born on July 24, 1961, completed high school, can communicate in English, and previously worked as an account clerk.  (Administrative Record ("AR") 29, 67, 81, 198, 209, 211, 247, 255, 578.)  Plaintiff filed a claim for DIB on August 21, 2017, alleging she became disabled on November 13, 2014, due to ADD, ADHD, anxiety, and depressive disorder.  (AR 67–68, 81–82, 198, 210, 247, 255.)

### A.      Relevant Evidence of Record[3]

#### 1.      Medical Evidence

Plaintiff presented to the Adventist Health Physicians Network in April 2013, complaining that she was "very stressed" about work problems and the "threatening behavior of her supervisor that started last week."  (AR 436.)  She described herself as shaky, unable to concentrate, depressed and having nightmares, but that Xanax was helping "some."  (AR 436.)  Jay D. Kerr, M.D., noted that Plaintiff was in "[n]o acute distress" but that her mood and affect was "stressed/anxious."  (AR 439.)  Dr. Kerr observed that Plaintiff was "off work due to severity of her symptoms and condition" and that she "may need formal counseling."  (AR 440.)

In May 2013, Plaintiff returned for medication refills.  (AR 432.)  She reported doing "better being off work" and feeling less stressed and less depressed."  (AR 432.)  Upon physical examination, Dr. Kerr found Plaintiff cooperative, with appropriate mood and affect, and in no acute distress and with clear coherent speech.  (AR 434.)  She "appear[ed] stressed with discussing work matters," and cried while discussing the "prospect of going back to work under the same supervisor."  (AR 434.)  Dr. Kerr observed Plaintiff was "not recovering well with stress of what happened at work to her" and was having posttraumatic stress, such that it was not in her "best interest at this time to have her go back to work  . . . as it appears that she will go back to the same supervisor when she returns to work."  (AR 435.)  He recommended that she continue off work for another month, continuing her medications, and counseling.  (AR 435.)

Plaintiff underwent counseling with psychologist Mariellen R. Reiber, Psy.D. with Kings

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

Counseling Center in May 2013.  (AR 445–49.)  She complained of anxiety, poor concentration, low self-esteem, low energy, being anxious all day, confusion, panic attacks, stress, anger, forgetfulness, depressed mood, libido change, flashbacks, sciatic nerve problems mood changes, ringing in her ears, and being easily distracted.  (AR 446, 448, 449.).  Dr. Reiber assessed Plaintiff with adjustment disorder with anxiety and depression.  (AR 446, 448.)

In June 2013, Plaintiff reported to Dr. Kerr that Dr. Reiber's counseling sessions had been "helping a lot with her recovery and dealing with issues."  (AR 396.)  Dr. Kerr found Plaintiff anxious and stressed but oriented, cooperative, in no acute distress and with clear coherent speech and intact cognitive function.  (AR 398.)  He noted she is "slowly improving, with the help of extensive counseling and therapy" and should continue for at least a couple more sessions of counseling before returning to work.  (AR 399.)

In October 2013, Plaintiff complained to Dr. Kerr that she was having anxiety because she was due to be laid off in January.  (AR 374.)  She was in no acute distress, but with "nervous/anxious" mood.  (AR 376–77.)  Dr. Kerr advised her to start an exercise regimen and "to seriously consider restarting psychotherapy."  (AR 377.)

In December 2013, Plaintiff reported to Dr. Kerr that she was "very stressed about being transferred to the prison yard to work, in place of being laid off" and claimed she had started having panic attacks.  (AR 367.)  Dr. Kerr found her anxious but not in acute distress.  (AR 369.)  He recommended she seek further psychological evaluation and treatment and "be off work for the next 1-2 months due to severe stress [and] anxiety issues."  (AR 369–70.)

Plaintiff again saw Dr. Reiber for counseling in January 2014.  The handwritten treatment notes from the session are difficult to discern (*see* AR 569–73), but indicate that "prison bothers [Plaintiff] bad" and "no job here in town excites [her]," so it is "hard to fill out applications."  (AR 573.)  That same month, Plaintiff saw Dr. Kerr.  (AR 365.)  She complained of continued depression and severe anxiety, but that Dr. Reiber was "helping her work through her issues."  (AR 365.)  No acute distress was noted, but stressed mood and affect was observed.  (AR 425.)

Dr. Kerr noted in February 2014 that Plaintiff "is feeling better being off work, with less stress, depression [and] no panic attacks."  (AR 421.)  She reported continuing to see Dr. Reiber

and that she had an appointment to see a psychiatrist.  (AR 421.)  Dr. Kerr noted that Plaintiff "continues to have a difficult time with trying to cope with going back to work, because of the excessive stress she had on-the-job with her supervisors.   [S]he is also very stressed with the thought of returning to the prison and having to interact with inmates."  (AR 423.)  He stated that it is not in Plaintiff's "best interest to return to her current job, due to the excessive stress and worsening of her mental illness."  (AR 423.)

In March 2014, Plaintiff reported she saw the psychiatrist but did not "connect well" with him.  (AR 416.)  She continued to complain of symptoms of stress about work at the prison and "issues related to paperwork with disability."  (AR 416.)  Dr. Kerr documented anxiety, but otherwise normal results, including no acute distress.  (AR 418.)  In May 2014, Dr. Kerr noted Plaintiff was "cooperative" with appropriate mood and affect.  (AR 409.)

Plaintiff presented for an independent medical evaluation with psychiatrist Gary L. Cavanaugh, M.D., in October 2014.  (AR 575–82.)  He noted she was "cooperative with the evaluation."  (AR 575.)  Plaintiff reported that she cries frequently, has ten panic attacks a month, and avoids stressful situations.  (AR 576.)   She takes antidepressants and denies psychiatric hospitalizations. (AR 577.)  Upon examination, Dr. Cavanaugh found Plaintiff "alert, spontaneous, and generally cooperative but very dramatic."  (AR 578.)  Her thoughts were circumstantial, her affect modulated, and her mood neutral.  (AR 578.)  She denied hallucinations, delusions, and current suicidal or homicidal ideation.  (AR 578.)  She claimed she is fearful of being a passenger in a car and has panic attacks.  (AR 578.)  She was oriented to time, place, and person.  (AR 579.)  According to Dr. Cavanaugh, Plaintiff's immediate memory appeared slightly reduced, and her recent and remote memory was intact but vague.  (AR 579.)  Plaintiff was able to solve simple calculations and a simple change-making problem, but her fund of general information was intact at a low level.  (AR 579.)  Dr. Cavanaugh found Plaintiff's responses to malingering screening questions did not suggest gross malingering, and her judgment in simple situations appeared intact. (AR 579.)  Her attention span and concentration were at least slightly decreased, and she put forth variable effort during the interview.  (AR 579.)  Dr. Cavanaugh assessed her intelligence in the low-average range.  (AR 579.)  His diagnostic impression of Plaintiff was documented as persistent

depressive disorder or dysthymia, unspecified anxiety disorder, personality disorder with histrionic and somaticizing features, and stimulant abuse or dependence "by history."  (AR 581.)

Plaintiff terminated services with Dr. Reiber in April 2016.  (AR 340–41.)   In the termination summary, Dr. Reiber noted Plaintiff had reported symptoms of anxiety, stress, nightmares, irritability, anger, concentration difficulties, mood difficulties, relationship conflicts, depression, and family losses.  (AR 340.)  Plaintiff's diagnosis of adjustment disorder with anxiety and depression was documented.  (AR 341.)  Dr. Reiber explained Plaintiff's coping skills had "improved greatly," with some goals "fully met" and other goals expected to progress on "her own" (AR 340.)  Dr. Reiber observed Plaintiff "reported significant [symptom] reduction" at the time treatment was terminated.  (AR 341.)

In January 2017, Plaintiff complained to Dr. Kerr of increased anxiety and stress  while her daughter and grandchildren were living with her.  (AR 323.)  Upon examination, Dr. Kerr found Plaintiff cooperative and non-suicidal, with normal judgment and anxious mood and affect.  (AR 326.)  She was given a refill of Xanax.  (AR 327.)  Plaintiff had a normal mental status exam in February 2017.  (AR 321.)  In July 2017, Plaintiff was alert and interactive with normal affect, and in no acute distress.  (AR 298.)

Plaintiff presented for medication refills in August 2017, and reported her mood "has been doing OK."  (AR 293.)  She reported trying marijuana and that she wanted to get a "card."  (AR 295.)  Dr. Kerr found her cooperative and non-suicidal, with normal judgment and anxiety.  (AR 296.) Plaintiff's depression and anxiety was documented as "stable on medication."  (AR 296.)  In November 2017, Plaintiff's mental status examination showed she was cooperative, alert, oriented, and in no acute distress, with normal judgment.  (AR 612.)

Plaintiff established care with Candice Golez, M.D., in December 2017.  (AR 608.)  She complained of depression, which was controlled on medication.  (AR 608.)  Upon physical examination, Dr. Golez found Plaintiff found alert, oriented, well-kempt in appearance, with good eye contact, normal speech, normal affect, normal mood, and not in acute distress.  (AR 608.)  In January 2018, her physical examination was same as the month prior.  (AR 606–07.)  Dr. Golez described Plaintiff's depression with anxiety as "stable."  (AR 607.)

1    Plaintiff complained to Dr. Golez in February 2018 that her "main problem is
2    concentration," which is why "she doesn't think she is able to work." (AR 603.)  Her mental status
3    examination was normal.  (AR 604.)  During this visit, Plaintiff provided Dr. Golez with physical
4    and mental evaluation forms, but Dr. Golez declined, noting that since this was Plaintiff's third
5    visit with her and with her long history of mental health problems, "I do not think I am fit to fill
6    out her form."  (AR 604.)

7    In April 2018, Plaintiff returned to Dr. Golez for medication refills, and stated her new
8    medication was "working well."  (AR 599). Dr. Golez documented a normal mental status
9    examination and characterized Plaintiff's depression with anxiety as "stable" (AR 599–600.)  Dr.
10   Golez found Plaintiff's mental status normal in September 2018 and described the Plaintiff's
11   depression with anxiety as "stable."  (AR 597.)

12   Plaintiff complained of worsening anxiety and depression in February 2019.  (AR 591.)  Dr.
13   Golez noted Plaintiff had good eye contact and normal speech, mood, and affect.  (AR 592.)  She
14   denied suicidal or homicidal ideations and was in not in acute distress.  (AR 591–92.)  Dr. Golez
15   gave Plaintiff a trial sample of Trintellix, and noted that her lack of concentration could be
16   attributed to depression, sleep apnea, or ADHD.  (AR 592.)

17   In March 2019, Plaintiff reported that physical activity has helped with her mood and that
18   she declined to start the new medication provided at last visit.  (AR 589.)  Dr. Golez assessed
19   Plaintiff with benzodiazepine dependence, which Plaintiff endorsed.  (AR 589–90.) Dr. Golez also
20   noted "chronic" lack of concentration caused by an attention and concentration deficit.  (AR 590.)

21        **2.      Opinion Evidence**

22        Following his examination of Plaintiff in October 2014, Dr. Cavanaugh opined that Plaintiff
23   is permanently "incapacitated for the performance of her usual duties."  (AR 582.)  He explained
24   that Plaintiff's

> ability to appropriately interact with peers, supervisors, and clients is impaired by
> the combination of her problems and the resultant over-reactiveness, emotional
> lability, focus on somatic issues, and anxiety.  Her regular attendance at work would
> also be affected by these factors.
>
> [. . .]

6

> It is difficult to sort out what might be some degree of exaggeration noted in the MMPI-2 profile from her dramatic and somatically focused style, along with her need for attention and support for her various symptoms and issues. Even if there may be some degree of exaggeration, however, what is left is such that she could not effectively, productively, and consistently carry out her duties.

(AR 582.)

In December 2017, Alan Goldberg, Psy.D., a state agency physician, reviewed the record and assessed Plaintiff's mental residual functional capacity (RFC).[4]  (AR 75–77.)  Dr. Goldberg opined that Plaintiff

> should be able to meet the following criteria on a sustained basis in a competitive, remunerative work context where there is relatively low interpersonal contact (e.g., low contact with the public, working alone or with limited contact with supervisor or co-workers): To understand, carry out, and remember simple instructions (e.g., understanding and learning terms, instructions, and procedures; maintaining attention /concentration for approximately 2 hour blocks; understanding, carrying out, & remembering 1 to 2 step instructions; recognizing a mistake and correcting it; being able to work consistently and at a reasonable pace for approximately 2 hour segments between arrival, first break, lunch, second break, and departure; attending work regularly without excessive early departures or absences during the typical 40 hour work week); to make simple judgments about work-related decisions; to respond appropriately to supervision, co-workers, and social interactions in the workplace, when interactions are limited in scope, frequency, and duration (e.g., asking simple questions or requesting assistance, accepting instructions, responding appropriately to criticism from supervisors, cooperating with others, appropriately handling disagreements with others, not distracting others or exhibiting behavioral extremes); and to deal with changes in a routine work setting.

(AR 76–77.)  Upon reconsideration in April 2018, another state agency physician, M. Koretzky, Ph.D., reviewed the record and found Plaintiff is capable of the following: maintaining attendance; completing a routine workweek at a consistent pace; interacting superficially with the public; getting along with coworkers and supervisors for routine task requirements; and adapting to routine changes in the work environment.  (AR 89–90.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Dr. Golez completed two "Mental Residual Functional Capacity Questionnaire" in March and May 2019, noting Plaintiff's diagnoses of major depression and anxiety.  (AR 354–56, 361–63.)  She opined that Plaintiff's inattention problems preclude performance for 15% or more of an 8-hour workday with regard to remembering locations, work-like procedures, understanding and remembering very short and simple instructions, and understanding and remembering detailed instructions.  (AR 354, 361.)  Dr. Golez also opined that Plaintiff was "easily distracted," which would preclude of performance for 15% or more of an 8-hour workday for maintaining attention and concentration for extended periods of time; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; and completing a normal workday without interruptions from psychologically based symptoms.  (AR 355, 362.)  Dr. Golez further opined that Plaintiff is "not very good with change and planning—these cause her anxiety," such that they preclude 15% or more of an 8-hour workday for traveling in unfamiliar places or use of public transportation; and setting realistic goals or making plans independently of others.  (AR 355, 362.)  According to Dr. Golez, Plaintiff would be absent or unable to complete a workday five days or more a month, but able to manage benefit payments.  (AR 356, 363.)  She opined that Plaintiff's limitations began in December 2013.  (AR 356, 363.)

**B.  Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on January 2, 2018, and again on reconsideration on April 16, 2018.  (AR 95–98, 102–07.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 108–09.)  The ALJ conducted a hearing on August 29, 2019.  (AR 37–66.)  Plaintiff appeared at the hearing with her non-attorney representative and testified as to her alleged disabling conditions and work history.  (AR 44–57.)

**1.  Plaintiff's Testimony**

Plaintiff testified she lives in a house with her husband.  (AR 44–45.)  She can "sometimes" perform household chores when she is not experiencing "depression, anxiety, [and] irritable bowel (IBS)," which is about 20 days per month.  (AR 45.)  According to Plaintiff, on a

typical day she is able to begin an activity such as vacuuming, but she will become distracted, and the task does not get completed.  (AR 46.)  Her husband accompanies her to appointments and grocery shopping because she is "afraid of anxiety, irritable bowel, [and] panic attacks."  (AR 46.)  Plaintiff testified that she has 12 panic attacks per month lasting 20 minutes.  (AR 47.)  She is taking medication for her mental health., but stopped going to therapy because "it didn't help."  (AR 47–48.)  According to Plaintiff, her mental health treatment, including medications, do not help.  (AR 48–49.)  Plaintiff testified that she is unable to concentrate and cannot read a book past the third page.  (AR 49.)  Plaintiff stated that "the depression is affecting the anxiety.  Or maybe the anxiety and the not being able to focus on anything and the frustration that I go through is just depressing."  (AR 50.)   According to Plaintiff, she is worried about side effects from her medications.  (AR 50–51.)  She testified that she lies down every day because she "[doesn't] feel like doing anything."  (AR 52.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing that Plaintiff had past work as an account clerk, Dictionary of Operational Titles (DOT) code 216.482-010, which was sedentary work, with a specific vocational preparation (SVP)[5] of 5.  (AR 60–61.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work experience and posed a series of hypotheticals about this person.  (AR 58–59.)  The VE was to assume this person can perform medium exertional work but should avoid concentrated exposure to workplace hazards such as dangerous moving machinery and unprotected heights.  (AR 59.)  The individual can understand, remember, and carry out instructions consistent with unskilled work but can perform no fast-paced production work.  (AR 59.)  The individual can also have occasional interaction with the public, coworkers, and supervisors.  (AR 59.)  The VE testified that such a person could not perform Plaintiff's past work, but could perform other jobs in the national economy, such as machine feeder, DOT code 699.686-010, medium work, with an SVP of 2; hand packager, DOT code 920.587-018,

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

medium work, with an SVP of 2; and laundry worker, DOT code 361.685-018, medium work, with an SVP of 2. (AR 59–60.) The result would be the same if the individual could have no interaction with the public, could avoid exposure to excessive vibration, and could work at all exertional levels. (AR 60–61.)

The ALJ asked the VE, in a second hypothetical, to consider an individual who: can do work at the light exertional level but should avoid concentrated exposure to excessive vibration; can occasionally climb ladders, ropes, or scaffolds; should avoid concentrated exposure to workplace hazards such as dangerous moving machinery and unprotected heights; and should avoid concentrated exposure to excessive vibration. (AR 61.) This individual can understand, remember, and carry out simple instructions consistent with unskilled work but cannot perform fast-paced production work. (AR 61.) The individual can have occasional interaction with coworkers and supervisors but no interaction with the public. (AR 61.) The VE testified that such a person could not perform Plaintiff's past work, but could perform other light jobs in the national economy, such as housekeeper, DOT code 323.687-014, with an SVP of 2; small product assembler, DOT code 706.684-022, with an SVP of 2; and hand cleaner, DOT code 709.687-010, with an SVP of 2. (AR 61–62.) According to the VE, all of the jobs identified would be available even with an additional limitation of requiring one to two five-minute breaks. (AR 63.) No work would be available, however, if the person would be off task for 10% of the day plus regularly scheduled breaks or would miss work one to two days per month. (AR 63.)

Plaintiff's attorney posed a hypothetical involving a person who was unable to complete an eight-hour workday two days per month. (AR 64.) The VE testified that there would be no work such a person could perform. (AR 64.) The same was true for a person who would need unscheduled breaks every one to two hours for ten minutes and would need to walk around every 30 minutes for 10 minutes. (AR 65.)

C.     The ALJ's Decision

In a decision dated September 24, 2019, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 15–31.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 17–31.) The ALJ decided that Plaintiff met the insured status

requirements of the Act through March 31, 2019, and she had not engaged in substantial gainful activity between November 13, 2014, the alleged onset date (step one), through her date last insured.  (AR 17.)  At step two, the ALJ found Plaintiff's following impairments to be severe: depression, anxiety disorder, panic disorder, and personality disorder.  (AR 18–19.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 19–21.)

The ALJ then assessed Plaintiff's RFC and applied the assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: she should avoid concentrated exposure to workplace hazards such as dangerous moving machinery and unprotected heights.  She can understand, remember, and carry out simple instructions consistent with unskilled work.  She can perform no fast-pace production work (that is, hourly production goals).  She can have no interaction with the public.  She can have occasional interaction with coworkers and supervisors.

(AR 21–29.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 21–22.)

The ALJ determined that, given her RFC, Plaintiff could not perform her past relevant work (step four), but she could perform a significant number of other jobs in the local and national economies, specifically machine feeder, hand packager, and laundry worker (step five).  (AR 30–31.)  The ALJ concluded that Plaintiff was not disabled from November 13, 2014, through the date of the decision.  (AR 31.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on May 28, 2020.  (AR 6–11.)  Therefore, the ALJ's decision became the final decision of the

1   Commissioner.  20 C.F.R. § 404.981.

2                          **III.        LEGAL STANDARD**

3   **A.    Applicable Law**

4          An individual is considered "disabled" for purposes of disability benefits if they are unable

5   "to engage in any substantial gainful activity by reason of any medically determinable physical or

6   mental impairment which can be expected to result in death or which has lasted or can be expected

7   to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However,

8   "[a]n individual shall be determined to be under a disability only if [their] physical or mental

9   impairment or impairments are of such severity that [they] are not only unable to do [their] previous

10  work but cannot, considering [their] age, education, and work experience, engage in any other kind

11  of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

12         "The Social Security Regulations set out a five-step sequential process for determining

13  whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*,

14  180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.

15  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

16         In step one, the ALJ determines whether a claimant is currently engaged in
           substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ
17         proceeds to step two and evaluates whether the claimant has a medically severe
           impairment or combination of impairments. If not, the claimant is not disabled. If
18         so, the ALJ proceeds to step three and considers whether the impairment or
           combination of impairments meets or equals a listed impairment under 20 C.F.R. pt.
19         404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If
           not, the ALJ proceeds to step four and assesses whether the claimant is capable of
20         performing [their] past relevant work. If so, the claimant is not disabled. If not, the
           ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to
21         perform any other substantial gainful activity in the national economy. If so, the
           claimant is not disabled. If not, the claimant is disabled.
22

23  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4)

24  (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found

25  to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

26  steps."  *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

27         "The claimant carries the initial burden of proving a disability in steps one through four of

28  the analysis."  *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

                                                   12

1989)).  "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

1  1993)).

2      Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

3  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

4  454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

5  that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

6  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*,

7  466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally

8  falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409

9  (2009) (citations omitted).

10                    **IV.        DISCUSSION**

11      Plaintiff contends the ALJ erred in failing to properly articulate the reasons for rejecting the

12  opinion of Plaintiff's treating physician Dr. Golez regarding Plaintiff's mental limitations.  She

13  also contends the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's

14  subjective-symptom testimony.  Plaintiff asks this Court to remand for payment of benefits, or

15  alternatively for further proceedings.  (Docs. 14, 17.)

16      The Commissioner contends that the ALJ reasonably considered Dr. Golez's opinion, and

17  that substantial evidence supports the ALJ's evaluation of Plaintiff's symptoms.  (Doc. 16.)

18  **A.      The ALJ's Treatment of Dr. Golez's Opinion Was Not Erroneous**

19        **1.      Legal Standard**

20      Plaintiff's claim is governed by the agency's "new" regulations concerning how ALJs must

21  evaluate medical opinions for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c.  The

22  regulations set "supportability" and "consistency" as "the most important factors" when

23  determining the opinions' persuasiveness.  20 C.F.R. § 404.1520c(b)(2).  And although the

24  regulations eliminate the "physician hierarchy," deference to specific medical opinions, and

25  assigning "weight" to a medical opinion, the ALJ must still "articulate how [they] considered the

26  medical opinions" and "how persuasive [they] find all of the medical opinions."  20 C.F.R. §

27  404.1520c(a)–(b).

28      Recently, the Ninth Circuit has issued the following guidance regarding treatment of

physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). Accordingly, under the new regulations, "the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id*. at 787.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, *id*. § 404.1520c(b)(2)." *Woods*, 32 F.4th at 792. "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Id*. at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)) "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

As the Ninth Circuit also observed,

> The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion. *See id*. § 404.1520c(c)(3). Thus, an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. *Id*. § 404.1520c(c)(3)(i)–(v). However, the ALJ no longer needs to make specific findings regarding these relationship factors:

*Woods*, 32 F.4th at 792. "A discussion of relationship factors may be appropriate when 'two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same.'" *Id*. (quoting § 404.1520c(b)(3)). "In that case,

1   the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'" *Id.*

2       With these legal standards in mind, the Court reviews the weight given to Dr. Golez's

3   opinion.

4       **2.      Analysis**

5       In weighing Dr. Golez's opinion related to Plaintiff's mental functioning, the ALJ reasoned

6   as follows:

> She also filled out some fill-in-the-blank and checkmark forms about mental
> functioning that are not supported and not consistent with the evidence (Exs. 7F;
> 9F).  She opined that the claimant's depression and anxiety preclude performance
> for 15% or more of an 8-hour workday with regard to remembering locations, work-
> like procedures, understanding and remembering very short and simple instructions,
> and understanding and remembering detailed instructions (Exs. 7F/1; 9F).  The only
> explanation Dr. Golez provided was "due to problems from inattention" (Exs. 7F/1;
> 9F).  Dr. Golez also opined preclusion of performance for 15% or more of an 8-hour
> workday for maintaining attention and concentration for extended periods of time,
> sustaining an ordinary routine without special supervision, working in coordination
> with or in proximity to others without being distracted by them, making simple
> work-related decisions and completing a normal workday with her only explanation
> a mention that the claimant is easily distracted (Exs. 7F/2; 9F).  Similarly, she opined
> 15 or more preclusion for traveling in unfamiliar places or use of public
> transportation and setting realistic goals or making plans independently of others
> only pointing out that "she is not very good" with change and planning (Exs. 7F/2;
> 9F).  She opined 5 or more absences or inability to complete a workday 5 times a
> month without explanation (Exs. 7F/3; 9F).  Strangely, despite opining such extreme
> limitations she then opined the claimant is able to manage funds (Exs. 7F/3; 9F/3).
> Although she has only treated the claimant since December 2017, she explained the
> claimant's limitations began in 2013 (Exs. 7F/3; 9F/3).  The mental limitations she
> opined are simply not supported and not consistent with the evidence.  Her opinion
> about mental functioning is not persuasive.  Another document is simply a list of
> medications and is not a medical opinion (Ex. 10F).  Overall her various opinion
> statements are not persuasive because they are not supported and they are not
> consistent with the evidence including the treatment notes.

(AR 28–29.)

       The Court concludes that the ALJ properly evaluated the supportability and consistency of

Dr. Golez's opinion.  As to supportability, the ALJ properly considered Dr. Golez's failure to

adequately explain her reasoning.  *See* 20 C.F.R. § 404.1520c(c)(1) (requiring the ALJ to consider

"supporting explanations presented by a medical source.").  As the ALJ observed, Dr. Golez's

opinion regarding Plaintiff's mental limitations were cursory in nature and did not adequately

explain why, for example, Plaintiff being "easily distracted" would so severely impair her such that

she would be precluded for 15% or more of an 8-hour workday from maintaining attention and concentration for extended periods of time; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; and completing a normal workday without interruptions from psychologically based symptoms.  (AR 355, 362.)  Dr. Golez also failed to provide an explanation why the opined limitations began in December 2013, when she had only begun seeing Plaintiff in December 2017.  (AR 354, 356, 361, 363.)  The lack of supporting explanations was a proper consideration in evaluating the supportability of Dr. Golez's opinion. *See* 20 C.F.R. § 404.1520c(c)(1); *Woods*, 32 F.4th at 794 (substantial evidence supported finding that medical opinion, expressed in a "fill-in-the-blank questionnaire," was "not persuasive because it is not supported by any explanation" or "pertinent exam findings."); *Ponce v. Comm'r of Soc. Sec.*, No. 1:20-CV-01664-EPG, 2022 WL 196529, at *3 (E.D. Cal. Jan. 21, 2022) (declining to find the ALJ erroneously rejected medical opinion where given on a "checkbox form with no significant narrative explanation" and "no citation to record evidence.").

As to consistency, the ALJ found Dr. Golez's opinion concerning Plaintiff's mental limitations was generally inconsistent with the medical record, including her own treatment notes. Although the ALJ did not cite to any records in connection with this finding, the preceding paragraphs contain a summary of medical records with specific citations and explanation.  (AR 22–25.)  For example, the ALJ cited to a May 2014 treatment record reporting that Plaintiff had appropriate mood and affect.  (AR 23, 409.)  In April 2016, Plaintiff's adjustment disorder with anxiety and depression was noted, but also that her coping skills had "improved greatly," with some goals "fully met" and other goals expected to progress on "her own", with Plaintiff reporting "significant [symptom] reduction."  (AR 341.)  As the ALJ noted (AR 24), Plaintiff had normal mental status exams in February, July, August, and November 2017, with her treating provider noting that her depression and anxiety was "stable on medication."  (AR 296, 298, 321, 612.)

Dr. Golez's treatment notes from January 2018 document Plaintiff as alert, oriented, well-kempt in appearance, with good eye contact, normal speech, normal affect, normal mood, and not in acute distress, with her depression with anxiety listed as "stable."  (AR 607.)  Plaintiff's mental

status examination by Dr. Golez was normal in February 2018.  (AR 604.)  She reported to Dr. Golez in April 2018 that her new medication was "working well," and Dr. Golez documented a normal mental status examination and characterized Plaintiff's depression with anxiety as "stable" (AR 599–600.)  In September 2018, Dr. Golez again found Plaintiff's mental status normal and described the Plaintiff's depression with anxiety as "stable."  (AR 597.) Dr. Golez observed Plaintiff had good eye contact and normal speech, mood, and affect in February 2019.  (AR 592.) In March 2019, Plaintiff reported that physical activity has helped with her mood. (AR 589.)  Thus, while the medical record reflects that Plaintiff has mental impairments, it was reasonable for the ALJ to conclude that the record did not support the severity of Dr. Golez's opined restrictions, including that Plaintiff was unable to understand and remember very short and simple instructions and make simple work-related decisions for 15% or more of the workday, and would miss 5 days or more days of work per month.  (AR 354–56, 361–63.)  Thus, the ALJ's findings that Dr. Golez's opinions were inconsistent with her own treatment notes and with the objective medical evidence as a whole are legally sufficient and supported by substantial evidence.  *See Batson v. Comm'r Soc. Sec. Admin*., 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

Plaintiff asserts that the ALJ's finding was improper because it failed to "properly consider and evaluate the opinion" of examining physician Dr. Cavanaugh, which she contends "further supports" Dr. Golez's opinion.  (Doc. 14 at 13–16.)  Plaintiff's assessment by Dr. Cavanaugh, however, is not as supportive she would have the Court believe.  For example, Dr. Cavanaugh found that Plaintiff could solve simple calculations and a simple change-making problem, that her "[j]udgment in simple situations" was intact, and that her attention span and concentration were only "*slightly* decreased."  (AR 579) (emphasis added).)  These findings stand in stark contrast to the severe impairments opined by Dr. Golez regarding Plaintiff's mental abilities.  Moreover, as the ALJ pointed out (AR 28), Dr. Cavanaugh's ultimate opinion was only that Plaintiff could not perform her "usual duties," *i.e*., her **past** work.  (AR 582.)  Nowhere in his opinion does he suggest that Plaintiff could not perform **any other** work.  Yet Dr. Golez's opinion, if credited, would dictate such a result per the VE's testimony.  (*See* AR 63–64 (no work available for a person who would

be off task for 10% of the day or would miss or be unable to complete an eight-hour workday one to two days per month.).)

In sum, the Court finds that the ALJ's reasons for the weight given to Dr. Golez's opinion are legally sufficient and supported by substantial evidence.

**B.      The ALJ Properly Discounted Plaintiff's Subjective Symptom Allegations**

**1.      Legal Standard**

The test for deciding whether to accept a claimant's subjective symptom testimony turns on whether the claimant produces medical evidence of an impairment that reasonably could be expected to produce the symptoms alleged. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1281–82 & n.2 (9th Cir. 1996).  The Commissioner may not discredit a claimant's testimony on the severity of symptoms merely because they are unsupported by objective medical evidence. *Reddick*, 157 F.3d at 722*; Bunnell*, 947 F.2d at 343, 345.  If the ALJ finds the claimant's testimony not credible, the ALJ "must specifically make findings which support this conclusion." *Bunnell*, 947 F.2d at 345.  The ALJ must set forth "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 345-46.  Unless there is evidence of malingering, the ALJ can reject the claimant's testimony about the severity of a claimant's symptoms only by offering "specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1283-84; *see also Reddick*, 157 F.3d at 722.  The ALJ must identify what testimony is not credible and what evidence discredits the testimony. *Reddick*, 157 F.3d at 722; *Smolen*, 80 F.3d at 1284.

**2.      Analysis**

As noted above, in determining Plaintiff's RFC, the ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms. (AR 21.)  The ALJ also found that Plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were "inconsistent" with the RFC.  (AR 22.)  Because the ALJ did not make any finding of malingering, the ALJ was required to provide clear and convincing

reasons supported by substantial evidence for discounting Plaintiff's subjective symptom allegations. *Smolen*, 80 F.3d at 1283-84; *Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008). Here, the ALJ provided at least three valid reasons for not fully recrediting Plaintiff's testimony and allegations.

a.  Inconsistent with Medical Evidence

First, the ALJ found Plaintiff's subjective symptom testimony to be inconsistent with the objective medical evidence, which was summarized earlier in the decision. (AR 25.) An ALJ is permitted to consider whether there is a lack of medical evidence to corroborate a claimant's alleged symptoms so long as it is not the only reason for discounting a claimant's subjective symptom allegations. *Burch*, 400 F.3d at 680-81. As detailed above, mental status examinations during the relevant period were normal. (AR 296, 298, 321, 592, 597, 599–600, 604, 607, 612.) Plaintiff's treatment providers documented her depression and anxiety as "stable" with medication treatment.[6] (AR 296, 298, 321, 597, 599–600, 607, 612.) *See Warre v. Comm'r of Soc. Sec*., 439 F.3d 1001, 1006 (9th Cir. 2006) (impairments that can be controlled effectively with medication are not disabling).

b.  Activities of Daily Living

Second, the ALJ determined that Plaintiff's activities of daily living are "not as limited as would be expected in light of her allegations." (AR 25.) The ALJ noted that, according to Plaintiff's spouse, Plaintiff lives independently, runs errands, performs house and yard work, cooks, drives, handles funds, and performs her own personal care.[7] (AR 20, 229–36.) An ALJ

---

[6] In rejecting Plaintiff's subjective complaints, the ALJ also characterized Plaintiff's treatment as "conservative." (AR 25.) It is unclear whether counseling and psychiatric medications such as Xanax constitutes conservative treatment. (*See, e.g.*, AR 327, 341, 436.) *See McKenzie v. Kijakazi*, No. 1:20-CV-0327 JLT, 2021 WL 4279015, at *8 (E.D. Cal. Sept. 21, 2021) (ALJ erred by finding claimant's prescribed treatment of Xanax, Latuda, Zoloft, and Hydroxyzine conservative). The Court, however, does not need to reach that determination here because the ALJ provided other valid reasons for discrediting Plaintiff's subjective complaints. *See Reyes v. Berryhill*, 716 F. App'x 714, 714 (9th Cir. 2018) (where ALJ provided valid reasons for discounting claimant's testimony, "[a]ny error in other reasons provided by the ALJ was harmless"); *Batson*, 359 F.3d at 1197; *Williams v. Comm'r, Soc. Sec. Admin*., Civ. No. 6:16–cv–01543–MC, 2018 WL 1709505, *3 (D. Or. Apr. 9, 2018) ("Because the ALJ is only required to provide a single valid reason for rejecting a claimant's pain complaints, any one of the ALJ's reasons would be sufficient to affirm the overall . . . determination.").

[7] The ALJ also cites to 124 pages of handwritten notes from Plaintiff's therapist as evidencing Plaintiff's "involve[ment] with her family's complicated life." (AR 25 (citing AR 451–574).) These notes, as the ALJ admits, are "mostly unreadable." (AR 23.) Plaintiff criticizes the ALJ's reliance on the notes as whole, asserting that they give rise to a duty to develop the record. (*See* Doc. 14 at 28.) The Court need not resolve this issue, however, because

may properly consider a claimant's daily activities when evaluating credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (the nature of daily activities may be considered when evaluating credibility). Moreover, in evaluating a claimant's credibility, an ALJ may consider inconsistencies between the claimant's testimony and the claimant's conduct and whether the claimant engages in daily activities inconsistent with the alleged symptoms. *Molina*, 674 F.3d at 1112. Even where those activities suggest some difficulty functioning, they are grounds for discrediting Plaintiff's testimony to the extent that they contradict claims of a totally debilitating impairment. *Id.* at 1113.

According to Plaintiff, the ALJ erred in failing to take into account her testimony that she is precluded from performing household tasks about 20 days per month, rendering her unable to work. (Doc. 14 at 27 (citing AR 45).) Plaintiff's husband's account of her activity level demonstrates otherwise. (*See* AR 229–36 (Plaintiff has no problem with daily personal care, feeds their two dogs, makes dinner for her and her husband "once or twice a week," and does laundry but "does not always complete it that same day.").) While disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations, where the level of activity is inconsistent with a claimant's claimed limitation, those activities have bearing on the claimant's credibility. *Reddick*, 157 F.3d at 722. As the Ninth Circuit explained in *Fair*, 885 F.2d at 604, "if [the plaintiff] remains able to perform ordinary household and personal tasks, then he has not carried his burden of proving that his pain prevents him from returning to [work]. While such reasoning may not hold up in all cases . . . it is sufficient here, as [the plaintiff] has not put forward any evidence that reconciles the inconsistency between his words and his actions." Such circumstances are evident in this case.

The ALJ's decision recognized that Plaintiff has some work limitations, but properly discredited Plaintiff's testimony that her limitations render her completely unable to work. *Fair*, 885 F.2d at 604; *see also Bunnell*, 947 F.2d at 346 ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence."). Where the ALJ

the record contains sufficient other evidence, particularly Plaintiff's husband's statement, regarding Plaintiff's activity level.

1   makes a reasonable interpretation of the claimant's testimony, it is not the Court's role to second-
2   guess it. *Rollins*, 261 F.3d at 857.

3                            c.      Reason for Work Cessation

4          Lastly, Plaintiff does not address the ALJ's finding that her work history undermines her
5   subjective complaints.  (AR 25.)  An ALJ is allowed to make an adverse credibility finding based
6   on a claimant's work history where the claimant lost their previous employment due to reasons that
7   were not related to their disability.  *See, e.g., Drouin v. Sullivan*, 966 F.2d 1255, 1258–59 (9th Cir.
8   1992) (finding that the ALJ did not err by discounting the plaintiff's credibility because, in part,
9   the plaintiff "did not lose her past two jobs because of pain"); *Caldwell v. Comm'r of Soc. Sec.*,
10  No. 2:15–cv–1002–KJN, 2016 WL 4041331, at *6 (E.D. Cal. July 26, 2016) (finding that "the ALJ
11  reasonably relied on [the] plaintiff's work record in discounting her credibility" where "there [was]
12  evidence suggesting that [the] plaintiff had stopped working for reasons not related to her
13  impairments"); *Clark v. Colvin*, No. C13–0747–JCC, 2013 WL 6095842, at *3 (W.D. Wash. Nov.
14  20, 2013) (finding that the ALJ did not err in finding the claimant's "subjective complaints . . . less
15  credible" based on the claimant's work history where the claimant's "job ended for economic
16  reasons instead of impairment-related reasons").

17         According to Plaintiff, the reason she stopped working in December 2013 was due to a
18  "reduction of force" that resulted in her being reassigned to the mailroom at the prison.  (AR 210.)
19  Her decision to cease employment was therefore unrelated to her impairments and undermines her
20  assertion of total disability. Although Plaintiff may have been stressed by the thought of the
21  reassignment, the record shows that such stress was directed at the prospect of continuing to work
22  at the prison.  (*See* AR 367, 423.)  At best, this supports an inability by Plaintiff to perform her past
23  work in a prison environment, with which the ALJ agreed, but not an inability to perform <u>all</u> work.
24  The fact that Plaintiff stated to her counselor that it is "hard to fill out applications" because "no
25  job here in town excites [her]" further evidences an unwillingness, rather than an inability, to work.
26  (*See* AR 573.)

27         Plaintiff disagrees with the ALJ's interpretation of the evidence, but it is the ALJ's
28  responsibility to resolve conflicts in the medical evidence and ambiguities in the record.  *Andrews*

*v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Where the ALJ's interpretation of the record is reasonable, as it is here, it should not be second-guessed. *Rollins*, 261 F.3d at 857; *see also Thomas*, 278 F.3d at 954 ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.").

The Court finds the ALJ discounted Plaintiff's subjective symptom allegations for clear and convincing reasons supported by substantial evidence.

## V.      CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **August 1, 2022**                    /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE